UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NORMA I. RIOS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 3:15-cv-30190-KAR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant | ) | |

<u>MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF
THE COMMISSIONER</u>
(Dkt. Nos. 17 & 21)

ROBERTSON, U.S.M.J.

I.     I<span>NTRODUCTION</span>

Before the court is an action for judicial review of a final decision by the Acting

Commissioner of the Social Security Administration ("Commissioner") regarding an individual's

entitlement to Social Security Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3).  Plaintiff Norma I. Rios

("Plaintiff") asserts that the Commissioner's decision denying her such benefits -- memorialized

in an April 25, 2014 decision of an administrative law judge ("ALJ") -- is not supported by

substantial evidence and was made in error.  Specifically, Plaintiff alleges that the ALJ

committed three errors by failing to:  (1) find that fibromyalgia was a severe impairment at step

two of the five-step sequential evaluation process; (2) consider Plaintiff's obesity's impact on her

musculoskeletal system at step three; and (3) support her Residual Functional Capacity ("RFC")

1

assessment with substantial evidence.  Plaintiff has filed a motion to reverse or remand (Dkt. No. 17) and the Commissioner, in turn, has moved to affirm (Dkt. No. 21).

The parties have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the following reasons, the court will ALLOW the Commissioner's motion to affirm and DENY Plaintiff's motion to reverse and remand.

II.   FACTUAL BACKGROUND

Plaintiff completed high school and took college courses in industrial engineering, data entry, and medical billing in Puerto Rico before coming to Massachusetts on June 16 or 18, 2012 (Administrative Record ("A.R.") at 42, 51).  In Puerto Rico, she worked full-time for about seven years as a medical secretary until her health prevented her from performing the job (*id.* at 44, 52, 625).  She stopped working on June 14, 2012, a few days before she came to the United States, when she was 48 years old (*id.* at 42, 250, 623).  In her applications for DIB and SSI, Plaintiff alleged that she was disabled due to lumbosacral and cervical-dorsal radiculopathy, lumbosacral and cervical-dorsal "neural foraminal [stenosis]" and "central stenosis/HNP cord compression" (*id*. at 250).

III.   PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI on June 21, 2012 alleging an onset of disability on June 14, 2012 (*id*. at 210, 215).  The applications were denied initially and upon reconsideration (*id*. at 121-24, 128-30, 133-35).  Following a hearing on January 22, 2014, the ALJ issued her decision on April 25, 2014 finding Plaintiff was not disabled (*id.* at 21, 30).  The Appeals Council denied review (*id.* at 1-5).  This appeal followed.[1]

---

[1] Plaintiff indicates that, after she filed the appeal in this court, she filed new applications, which the Commissioner approved (Dkt. No. 18 at 2 n.2).

IV.   DISCUSSION

A.   Legal Standards

1.   Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final

decision of the Commissioner, with or without remanding for a rehearing.  *See* 42 U.S.C. §§

405(g), 1383(c)(3).  Judicial review "is limited to determining whether the ALJ used the proper

legal standards and found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc.*

*Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  The court reviews questions of law de novo, but must

defer to the ALJ's findings of fact if they are supported by substantial evidence.  *See id*. (citing

*Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)).  Substantial evidence exists "'if a reasonable

mind, reviewing the evidence in the record as a whole, could accept it as adequate to support

[the] conclusion.'"  *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir.

1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir. 1981)).

"Complainants face a difficult battle in challenging the Commissioner's determination because,

under the substantial evidence standard, the [c]ourt must uphold the Commissioner's

determination, 'even if the record arguably could justify a different conclusion, so long as it is

supported by substantial evidence.'"  *Amaral v. Comm'r of Soc. Sec.*, 797 F. Supp. 2d 154, 159

(D. Mass. 2010) (quoting *Rodriguez Pagan v. Sec'y of Health & Human Servs.,* 819 F.2d 1, 3

(1st Cir. 1987)).  In applying the substantial evidence standard, the court must be mindful that it

is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts

in the evidence, and draw conclusions from such evidence.  *See Irlanda Ortiz,* 955 F.2d at 769.

That said, the Commissioner may not ignore evidence, misapply the law, or judge matters

entrusted to experts.  *See Nguyen*, 172 F.3d at 35.  "If the ALJ has made a legal or factual error,

the court should reverse or remand such a decision to consider new material evidence or to apply the correct legal standard." *Boulia v. Colvin*, Case No. 15-cv-30103-KAR, 2016 WL 3882870, at *1 (D. Mass. July 13, 2016) (citing *Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); 42 U.S.C. § 405(g)).

       2.    <u>Standard for Entitlement to Social Security Disability Insurance Benefits and Supplemental Security Income.</u>

In order to qualify for DIB, a claimant must demonstrate that she was disabled within the meaning of the Social Security Act (the "Act") prior to the expiration of her insured status. *See* 42 U.S.C. § 423(a)(1)(A), (D). SSI benefits, on the other hand, require a showing of both disability and financial need. *See* 42 U.S.C. § 1381a. Plaintiff's need, for purposes of SSI, and insured status, for purposes of DIB, is not challenged.

The Act defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is considered disabled under the Act

> only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–49 (1987).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in regulations promulgated under the Act. *See* 20 C.F.R. §§

404.1520(a), 416.920(a).  The hearing officer must determine:  (1) whether the claimant is

engaged in substantial gainful activity; (2) whether the claimant suffers from a severe

impairment; (3) whether the impairment meets or equals a listed impairment contained in

Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from

performing previous relevant work; and (5) whether the impairment prevents the claimant from

doing any work considering the claimant's age, education, and work experience.  *See id*; *see also*

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the

five-step process).  If the hearing officer determines at any step of the evaluation that the

claimant is or is not disabled, the analysis does not continue to the next step.  *See* 20 C.F.R. §§

404.1520, 416.920.

Before proceeding to steps four and five, the Commissioner must make an assessment of

the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant

can do past relevant work and at step five to determine if the claimant can do other work.  *See id*.

"The RFC is an administrative assessment of the extent to which an individual's medically

determinable impairment(s), including any related symptoms, such as pain, may cause physical

or mental limitations or restrictions that may affect his or her capacity to do work-related

physical and mental activities."  Social Security Ruling ("SSR") 96-8p, 1996 WL 374187, at *2

(July 2, 1996).  Put another way, "[a]n individual's RFC is defined as 'the most you can still do

despite your limitations.'"  *Dias v. Colvin*, 52 F. Supp. 3d 270, 278 (D. Mass. 2014) (quoting 20

C.F.R. § 416.945(a)(1)).

The claimant has the burden of proof through step four of the analysis.  At step five, the

Commissioner has the burden of showing the existence of jobs in the national economy that the

claimant can perform notwithstanding impairment(s).  *See Goodermote*, 690 F.2d at 7.

B.      Medical Records

1.      Physical condition.

Plaintiff presented the ALJ and the court with medical records that spanned the period

from 2005 through 2013.  Because Plaintiff alleged onset of disability mainly due to neck and

back pain on June 14, 2012, the date she stopped working as a medical secretary, details of the

relevant records before and after this date will be discussed.

a.      Medical Records:  2008 through June 13, 2012

An October 29, 2008 radiology report of Plaintiff's cervical spine (neck) showed:

"straightening of the cervical spine lordosis likely secondary to muscle spasm"; "degenerative

disease and spondylosis at C5/C6"; and "hypertrophy of the luschka joint at C5/C6, resulting in

mild bilateral foraminal stenosis" (A.R. at 452).  A CT scan and nerve conduction test were

performed on November 7, 2008 (*id.* at 338, 453).  The CT scan revealed "a very small centrally

herniated disc at C4/C5, C5/C6 and C6/C7" and "partial left neural foraminal stenosis at C5/C6"

(*id*. at 453).  There was "no definite evidence of canal stenosis" and "mild left neural foraminal

stenosis" (*id*.).  The nerve conduction test showed left ulnar neuropathy across the elbow and

"left C6 radiculopathy with evidence of acute denervation in the biceps and brachioradialis

muscle" (*id*. at 338).

On November 11, 2008, Plaintiff went to the hospital complaining of pain in her neck

that began two to three weeks earlier and pain radiating into her left arm (A.R. at 319).  Her neck

was tender to palpation at C4-C6 and her range of motion was limited (*id.* at 320).  An MRI that

was conducted the next day showed intervertebral disc desiccation with intervertebral disc bulges

at C4-C5 and C5-C6, and left lateral intervertebral disc herniation at C5-C6 level "producing

compression of exiting nerve roots" (*id.* at 345).  No myelomalacic changes were evident (*id.*).

6

In January 2010, radiology studies were conducted of Plaintiff's neck, lumbar spine (back), right wrist, and right hand (*id.* at 354-57).  A minimal rotoscoliotic deviation was present on her neck, thoracic spine, and lumbosacral spine (*id.* at 354-56).  Straightening of the lordosis, which suggested muscle spasm, and anterolateral osteophytic formations were present at the C5 and C6 levels of her cervical spine with "slight relative narrowing" at the C5-C6 level (*id.* at 356).  The radiographs of her lumbosacral spine showed "some relative straightening of the lordosis, which could represent postural effect versus muscle spasm" (*id.* at 354).  "Small anterolateral osteophytic formations" were observed at multiple levels of her lumbosacral spine along with grade 1 retrolisthesis at L4-L5 and "very slight spondylolisthesis" at L3-L4 levels (*id.* at 354).  "AP, lateral and carpal tunnel projections of the right wrist show[ed] no gross bony or joint abnormalities" (*id.* at 357).  There was "[n]o acute bony or joint pathology" observed in her right hand (*id.* at 504).  A December 2010 nerve conduction study of Plaintiff's upper extremities revealed a right median focal entrapment neuropathy at the wrist, and a left ulnar focal entrapment neuropathy at the elbow "(Cubital Tunnel Syndrome)" (*id.* at 349).  The electromyographic study was "compatible" with a right C6 radiculitis and a left C6 radiculopathy (*id.*).

In January 2011, Dr. Luis J. Deliz Varela assessed Plaintiff with pain in the low back, thoracic spine, and neck, along with neuralgia neuritis, unspecified radiculitis, generalized osteoarthrosis, and "[m]orbid obesity" (*id.* at 351).  Electroacupuncture and diet and exercise to promote weight loss were included in Dr. Deliz Varela's recommendations for treatment (*id.*).

Additional radiology studies were conducted on Plaintiff's neck and back in March 2011 (*id.* at 362-63).  The MRI of her neck showed "evidence of generalized osteophyte formations, disc desiccation and narrowing of the intervertebral discs spaces" and "congenital narrowing of

the canal with short pedicles and scanty epidural fat" (*id*. at 362).  The neck studies also showed mild central canal stenosis secondary to a mild posterior disc bulge at the C2-C3 level and moderate central canal stenosis secondary to a posterior disc bulge at the C3-C4 level (*id.*).  "The C3-C4, C4-C5 and C5-C6 levels show large posterior disc bulges, cord compression, canal stenoses and bilateral neural foramina stenoses" (*id.*).  The MRI of Plaintiff's lumbosacral spine showed grade 1 anterolisthesis of L4 on L5 and disc desiccation at this level, generalized osteophyte formations, and "generalized hypertrophy of the apophyseal joints" (*id.* at 363).  The central and lateral canal stenosis at the L4-L5 level was severe (*id.*).  At the L3-L4 level, the MRI showed mild central and moderate lateral canal stenosis secondary to a posterior disc bulge and hypertrophic apophyseal joints (*id.*).

In April 2011, Roberto Leon Perez, M.D. examined Plaintiff due to complaints of bilateral hand swelling (*id.* at 469).  Dr. Perez reported that:  Plaintiff's gait and station were normal; her upper extremities' ranges of motion were intact; and she had fairly good range of motion in her back without spasm, but she experienced pain on flexion and hyperextension (*id.*).  There was no evidence of "focal weakness, loss of sensation or incoordination" (*id.*).  Dr. Perez diagnosed Plaintiff with bilateral and ulnar nerve entrapment at the elbow and recommended a neurosurgical evaluation (*id.*).  In August 2011, Hector Cortes Santos, M.D. evaluated the electromyography of Plaintiff's back as demonstrating evidence of a chronic left L5 radiculopathy (*id.* at 370).

In May 2012, approximately one month before Plaintiff left Puerto Rico, she reported to the Caribbean Medical and Rehabilitation Corp. that her symptoms had not changed (*id*. at 365).  According to Plaintiff, her pain ranged from two to nine on a scale of ten and limited her range of motion in her neck and back (*id.*).

b.      Medical Records:  June 14, 2012 to January 22, 2014

Plaintiff first visited Northgate Medical P.C. in Springfield ("Northgate") on July 12, 2012 (*id.* at 543).  She returned on August 2, 2012 to follow up for the pain in her neck and lumbar spine (*id.* at 542).  She weighed 178 with a body mass index ("BMI") of 32 on that date (*id.*).

On August 7, 2012, Plaintiff underwent a noncontrast lumbar spine MRI at the Mercy Medical Center ("Mercy") (*id*. at 545, 614).  The most significant finding was at the L4-L5 level where the MRI showed broad-based posterior disc bulging, facet arthritic changes, "ligamentum flavum hypertrophy" with mild central canal stenosis and mild bilateral neural foraminal narrowing (*id.*).

Juichung Hung, M.D. evaluated Plaintiff at the Baystate Health Pain Management Center on September 18, 2012 for neck pain that radiated to her bilateral upper extremities and fingers, lower back pain that radiated to her lower extremities and toes, and midline back pain (*id*. at 558).  Plaintiff reported that her neck pain was worse than her back pain, and that she could shower and dress herself, but required assistance to tie her shoes and dry her hair (*id.*).  Her gait was normal, her muscle strength was 5/5 in her upper extremities, except her triceps, which were 4/5, and she had normal range of motion in her neck, with pain on flexion, extension, and lateral rotation (*id.* at 559-60).  The Spurling's test was positive on the right with pain radiating to her mid-forearm (*id*. at 560).[2]  There was decreased sensation in her entire left upper arm, her left

---

[2] "Physicians conduct a Spurling's test to assess nerve root compression and cervical radiculopathy by turning the patient's head and applying downward pressure.  A positive Spurling's sign indicates that the neck pain radiates to the area of the body connected to the affected nerve."  *Shaw v. A.T. & T. Umbrella Ben. Plan No. 1*, 795 F.3d 538, 543 (6th Cir. 2015) (citing *Spurling's Test,* Physiopedia.com, http://www.physio-pedia.com/Spurling's_Test (last visited July 12, 2015)).

forearm, and her left ulnar hand (*id.* at 559).  She had low back pain and the straight leg raise test

was negative bilaterally (*id.* at 560).  Dr. Hung recommended increasing her dosage of

Gabapentin and physical therapy, which Plaintiff reported had alleviated her pain in the past

(*id.*).  She engaged in physical therapy treatment at Baystate Rehabilitation Care from September

to October 2012 (*id.* at 573-76).

Radiological studies of Plaintiff's neck, which were conducted at Mercy in April 2013,

showed degenerative disc disease and spondylosis at C5-C6 (*id.* at 608-13).  The MRI showed

mild to moderate central and left neural foraminal stenosis at that site (*id.* at 609-10).  The

overall impression was multilevel spondylosis (*id.* at 610, 611).

Northgate referred Plaintiff to Christopher Comey, M.D. at New England Surgical

Associates who examined Plaintiff on May 30, 2013 (*id.* at 588).  Dr. Comey reported that

Plaintiff's gait was normal and her upper extremity motor examination was normal bilaterally

(*id.*).  He observed degenerative changes in Plaintiff's mid-cervical spine and upper thoracic

spine based on the April 18, 2013 MRI and opined that Plaintiff had "slight" stenosis at C4-C5,

C5-C6 and "to a lesser extent" at C6-C7 (*id.*).  He did not observe a significant spinal cord

compression or signal change (*id.*).  Dr. Comey's impression was that Plaintiff suffered from

cervical and lumbar spondylosis and that surgery would not provide "any significant measure of

lasting pain relief" due to the "widespread degenerative disease" unless she developed

"progressive objective findings consistent with cervical myelopathy" (*id.* at 589).

Claude Borowsky, M.D. of Pioneer Spine and Sports Physicians, P.C. ("Pioneer") treated

Plaintiff's neck and back pain beginning in August 2013 (*id.* at 590, 594).  Plaintiff reported that

she was functionally independent at home, that she exercised once a week, and that amitriptyline

and gabapentin helped her leg pain "quite a lot" (*id.* at 590-91).  Dr. Borowsky observed that

Plaintiff was "severely overweight" (BMI 34), stood "comfortably erect" and walked with a normal gait and station (*id.* at 591, 596).  Her coordination was normal and she had good mobility of all her extremities (*id.* at 592).  Dr. Borowsky found that Plaintiff had eighty percent range of motion in her neck "with mild discomfort in all maneuvers" and had seventy percent range of motion in her back with discomfort in rotation and extension (*id.* at 591-92).  Her straight leg raises were "weakly positive on the right" and negative on the left (*id.* at 592).  Carpal tunnel Tinel's sign was positive bilaterally on her wrists and positive at the cubital tunnel bilaterally (*id.*).  Dr. Borowsky's diagnosis included the following:  cervical spondylosis without myelopathy;[3] lumbar spondylosis without myelopathy; intervertebral lumbar disc displacement without myelopathy; thoracic or lumbosacral neuritis or radiculitis, unspecified; myalgia and myositis, unspecified; carpal tunnel syndrome, for which he ordered wrist splints; neuralgia neuritis and radiculitis, unspecified; and sacroiliitis, not elsewhere classified (*id.* at 593).  He recommended epidural steroid injections and physical therapy (*id.*).  Plaintiff received steroid infusions in August and November 2013 (*id.* at 599, 600-01).  In December 2013, she told Dr. Borowsky that the injections improved her radicular symptoms but provided no relief for the pain in her right buttock that radiated to her right leg and foot (*id.* at 595).

c.      Opinions of Examining Physicians

In March 2012, Rafael L. Oms-Rivera, M.D. indicated that Plaintiff's degenerative condition had not improved in more than five years despite medical treatment and that her prognosis for recovery was "poor" (*id.* at 391, 439).  He recommended restriction of the daily

---

[3] "Myelopathy" is a "[d]isorder of the spinal cord." *Stedman's Medical Dictionary* 583050 (Westlaw 2014).

activities that exacerbated her condition, "absolute rest," medication, physical therapy, and monthly visits to the physiatrist (*id.*).

Willard Brown, D.O., examined Plaintiff's neck, back, and hand/wrist area in September 2012 at the request of Disability Evaluation Services at UMass (*id.* at 552-53).  In describing her daily activities, Plaintiff indicated that she was able to drive and could up to lift ten pounds "with care if she had to" (*id.* at 553).  Dr. Brown observed that Plaintiff had a normal range of motion in her neck (*id.* at 553).  "She could do flexion, extension, left and right lateral bending, left and right rotation" (*id.*).  Her back was twenty-five percent restricted in flexion, and she was not restricted in extension, left and right rotation, and left and right lateral flexion (*id.*).  Her sitting straight leg raise produced pain in her low back at sixty degrees (*id.* at 554).  She had "significant paraspinal myofascial signs and symptoms" when she moved her neck and back and reported that the pain intensity level in both areas was nine on a scale of ten (*id.* at 553).  Her grip strength tests were the only abnormalities in her hands and wrists (*id.*).  Dr. Brown opined that Plaintiff suffered from chronic neck and low back pain -- bulging disc disease with degenerative osteoarthritic changes -- and bilateral chronic wrist/hand pain, numbness and weakness (*id.* at 554).  On October 2, 2012, Disability Evaluation Services determined that Plaintiff had a disability that was expected to last through October 2, 2013 (*id.* at 578).

Northgate physician's assistant (PA) Thu Nguyen completed a physical RFC questionnaire in August 2013 (*id.* at 586-87).  The form indicated that Plaintiff was unable to stand or sit for more than an hour during an eight hour workday or frequently lift more than ten pounds, and she could rarely bend, reach, and use her hands for repetitive pushing and pulling (*id.*).  She could occasionally use her hands and fingers for fine manipulation (*id.* at 587).  The PA estimated that Plaintiff would be absent from work more than four days per month (*id.*).

12

Although Plaintiff's abilities had decreased over the past twelve months due to chronic pain, they were expected to increase as the pain was alleviated (*id.*).

A Northgate employee, whose signature is illegible, completed a "Listing 1.04A Worksheet" on December 10, 2013 (*id*. at 622).  The form indicated that Plaintiff had spinal stenosis, osteoarthritis, and degenerative disc disease, that MRIs of Plaintiff's neck and back showed evidence of nerve root compression, that pain was distributed to her leg and arm, that she had limited motion in her spine, and that the straight leg test was positive for both sitting and standing (*id.*).  However, the form stated that Plaintiff did not have motor loss accompanied by sensory or reflex loss (*id.*).

　　　　d.　　Opinions of State Agency Non-Examining Consultants

S. Ram Upadhyay, D.O. completed an RFC form on September 27, 2012 (*id.* at 77, 79).  Based on a review of Plaintiff's medical records, Plaintiff's spinal disorder was deemed severe (*id.* at 75).  She could frequently lift ten pounds and could occasionally lift twenty pounds, and she could stand and/or walk and could sit for about six hours in an eight-hour workday (*id.* at 75-76).  There were no limitations on her ability to push or pull (*id.*).  Plaintiff had the ability to frequently climb ramps and stairs, balance, kneel, and crouch (*id.* at 76-77).  Occasionally she was able to climb ladders, ropes, and scaffolds, stoop, and crawl (*id.*).  While she could reach overhead occasionally, there were no limitations in her gross and fine motor abilities and her ability to feel (*id.* at 77).  Dr. Upadhyay opined that Plaintiff was not disabled (*id.* at 78).

Robert B. McGan, M.D. completed an RFC form and proffered his opinion that Plaintiff was not disabled on November 15, 2012 (*id.* at 103, 104).  In addition to Plaintiff's spinal disorders, Dr. McGan also considered Plaintiff's obesity and affective disorder (*id.* at 100).  Dr. McGan indicated that Plaintiff could stand and/or walk for four hours during an eight-hour

workday, and could sit for about six hours (*id.* at 102).  Otherwise Dr. McGan's RFC assessment

mirrored Dr. Upadhyay's (*id.* at 102-03).

      2.    Mental condition.

Plaintiff submitted mental health records from state examiner Peter Bishop, Ph.D. and the

Gandara Mental Health Center ("Gandara").  Dr. Bishop diagnosed Plaintiff with adjustment

disorder with depressed mood related to her decreased physical capacity (*id*. at 584).  Gandara's

records concurred with this assessment (*id.* at 633).

      C.    <u>The ALJ Hearing</u>

Plaintiff and independent VE James Parker testified before the ALJ (*id.* at 36).  At the

time of the ALJ hearing, Plaintiff was 62 inches tall and weighed 179 pounds (*id*. at 51).  She

described her work as a medical secretary and as a cashier, cleaner, and cook at gas

stations/convenience stores (*id.* at 44-45).  "Unbearable" pain often caused her to take two-hour

breaks while she worked as a medical secretary and, eventually, led her to resign (*id.* at 52-53).

She described the "terrible" pain in her lower back, which radiated toward her right buttock, hip,

and leg, and the "continuous" "burning" pain in her neck, which caused headaches, immobility of

her jaw, and difficulty raising her arms, particularly her left arm, and moving her hands and

fingers (*id.* at 46, 53, 54, 55, 57).  On a pain scale of one to ten, she rated the pain in her neck as

six or seven and in her arms as between seven and nine (*id.* at 54, 55).  The pain in her back was

equally severe and caused her to recline for most of the day (*id.* at 56).  She took medication for

pain and for depression and anxiety, which she attributed to her inability to work and to be

independent (*id.* at 46-47, 56-57).  Gabapentin, which she had taken for four years, relieved her

pain (*id.* at 46).

Plaintiff lived with her thirty-year-old son (*id.* at 48).  Until about a year before the

hearing, she also shared her home with her daughter and her two children, Plaintiff's

grandchildren (*id.*).  Plaintiff's daughter and four-year-old and seven-year-old grandchildren still

lived nearby and Plaintiff saw them almost every day (*id.* at 49).  Plaintiff cared for the children

"sometimes" (*id.*).  Plaintiff could dress and bathe herself, but needed extra time to accomplish

these tasks (*id.*).  Although she went to the supermarket twice a month and did her laundry at her

daughter's home once or twice a month, she testified that her condition caused her to stay at

home for two weeks out of each month (*id.* at 50, 58).

The VE, who testified as an expert witness, heard the Plaintiff's testimony (*id.* at 60).

The Dictionary of Occupational Titles ("DOT") defined Plaintiff's prior medical secretarial

position as a sedentary, skilled position and her cashier's job as light and unskilled (*id.*).  In

hypothetical # 1, the ALJ posed the following:

> [A]ssume . . . [a] younger individual to an individual closely approaching advanced age, who has the same educational background [as Plaintiff], which is a high school education, plus about a year of college, and the same past work experience [who] [h]as the following [RFC:]  [t]he individual can lift and carry up to 20 pounds occasionally and 10 pounds frequently.  They can stand and walk for four hours in an eight-hour day, and they can sit up to six hours in an eight-hour day.  They can occasionally crawl, crouch, kneel, balance, climb ramps and stairs and stoop.  They cannot climb ladders, ropes or scaffolds.  They can tolerate occasional overhead reaching.

(*id.* at 61).  The VE indicated that this person could perform Plaintiff's past work as a secretary

(*id.* at 61-62).  The ALJ altered the RFC for hypothetical # 2 to reflect an individual who had an

ability to sit or stand at will, and to occasionally stoop, climb ramps and stairs, and balance, but

who was unable to crouch, crawl, kneel, or climb ladders, ropes, and scaffolds (*id.* at 62).  The

VE opined that the individual could not perform secretarial work due to the sit/stand option (*id.*).

However, the person in hypothetical # 2 could perform the following light, unskilled jobs, which

existed in the national and regional economies:  entry level electronics worker, telephone

surveyor, and flower care worker at a florist shop (*id.* at 63).  The VE's opinion was based upon

his experience developing similar positions for employers and placing individuals with similar

limitations in comparable positions (*id.* at 64).  These jobs would not exist for a person who was

absent twice a month or needed to recline for half an hour to an hour in addition to breaking for

lunch (*id.* at 64, 67).

For hypothetical # 3, the ALJ added that the individual was limited to occasionally

reaching with her upper extremities in all directions (*id.* at 64).  The VE opined that this

limitation would eliminate employment (*id.* at 65).

D.    The ALJ's Decision

Following the hearing on January 22, 2014, the ALJ denied Plaintiff's claim on April 25,

2014 (*id*. at 21, 30).  In determining whether Plaintiff was disabled, the ALJ conducted the five-

part analysis required by the regulations.  At the first step, the ALJ found that Plaintiff had not

engaged in substantial gainful activity since the alleged onset date of June 14, 2012 (*id.* at 23).

20 C.F.R. §§ 404.1571 *et seq*., 416.971 *et seq*..  At step two, the ALJ found that Plaintiff was

severely impaired due to lumbar and cervical degenerative changes, obesity (Level I – BMI 34),

left cubital tunnel/ulnar neuropathy,[4] left C6 radiculopathy, and osteoarthritis (A.R. at 23-24).

20 C.F.R. §§ 404.1520(c), 416.920(c).  The ALJ found that Plaintiff's hypertension, which was

controlled by medication, and depression were not severe and that the record did not contain a

---

[4] "'Cubital tunnel syndrome . . . is caused by increased pressure on the ulnar nerve, which passes close to the skin's surface in the area of the elbow commonly known as the "funny bone."' Symptoms of cubital tunnel syndrome include '[p]ain and numbness in the elbow,' '[t]ingling, especially in the ring and little fingers,' '[w]eakness affecting the ring and little fingers,' and '[d]ecreased ability to pinch the thumb and little finger.'"  *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 768 (7th Cir. 2014) (quoting *Cubital and Radial Tunnel Syndrome,* http://www.webmd.com/pain-management/cubital-radial-tunnel-syndrome (last visited Aug. 25, 2014)).

medical diagnosis of fibromyalgia (A.R. at 24).[5]  The ALJ recognized SSR 02-1p, 2002 WL

34686281 (Sept. 12, 2002), which says that "obesity can cause limitation of function" but

determined that Plaintiff's impairments, either alone or in combination did not meet or medically

equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1

(*id*. at 24-25).

    Before proceeding to step four, the ALJ determined that Plaintiff had the RFC to perform

light work,[6] with the following limitations:

> she can stand and walk up to 4 hours in an 8-hour workday.  She needs to alter sitting and
> standing at will.  She can occasionally stoop[,] balance, climb ramps, and climb stairs.
> She cannot crouch, crawl, kneel, or climb ladders, ropes, or scaffolds.  She can perform
> occasional overhead reaching.

(*id.* at 25).[7]

    At step four, the ALJ found that Plaintiff was not able to perform any past relevant work

(*id.* at 28).  *See* 20 C.F.R. §§ 404.1565, 416.965.  Finally, at step five, the ALJ determined, based

on the VE's testimony, that Plaintiff can perform jobs that exist in significant numbers in the

---

[5] The ALJ noted that the complaints associated with fibromyalgia were "considered in the
context of [Plaintiff's] other medically determinable impairments" (A.R. at 24).

[6] The Social Security Administration ("SSA") defines light work as that which:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job
> is in this category when it requires a good deal of walking or standing, or when it
> involves sitting most of the time with some pushing and pulling of arm or leg controls.
> To be considered capable of performing light work, [a claimant] must have the ability to
> do substantially all of these activities.  If someone can do light work, [the SSA]
> determine[s] that he or she can do sedentary work, unless there are additional limiting
> factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.

[7] The ALJ included in this assessment the impact of Plaintiff's obesity on her "ability to perform
routine movement and necessary physical activity within the work environment" (A.R. at 24).

national economy taking into account Plaintiff's age, education, work experience, and RFC, and,

therefore, Plaintiff was not disabled (A.R. at 28-29).

      E.     <u>Plaintiff's Objections</u>

Plaintiff raises three objections to the ALJ's decision. First, she criticizes the ALJ for

overlooking fibromyalgia as a severe impairment at step two of the five-step evaluation process

(Dkt. No. 18 at 11-14). Next, she argues that the ALJ violated SSR 02-1p, 2002 WL 34686281

by failing to consider Plaintiff's obesity at step three as it related to her spinal impairments (*id*. at

14-16). Finally, Plaintiff alleges that the ALJ's determination that Plaintiff was not disabled is

not supported by substantial evidence (*id*. at 16-20). Each of Plaintiff's complaints about the

ALJ's decision will be discussed in turn.

      1.     Because Plaintiff did not present the ALJ with the required medical diagnosis of fibromyalgia, there was no basis to find that the impairment was severe.

Plaintiff's first issue is quickly dismissed. She complains that, at step two of the

sequential evaluation, the ALJ did not find fibromyalgia or polyarthralgia to be severe

impairments (Dkt. No. 18 at 11-14).[8] However, the ALJ correctly noted that Plaintiff did not

submit a medical diagnosis of fibromyalgia as required by SSR 12-2p, 2012 WL 3104869, at *2

(July 25, 2012) (A.R. at 24).

"Fibromyalgia is defined as '[a] syndrome of chronic pain of musculoskeletal origin but

uncertain cause.' Further, '[t]he musculoskeletal and neurological examinations are normal in

fibromyalgia patients, and there are no laboratory abnormalities.'" *Johnson v. Astrue*, 597 F.3d

409, 410 (1st Cir. 2009) (per curiam) (citations omitted). "The SSA acknowledges through SSR

_____

[8] "'[P]olyarthralgia' means pain in two or more joints." *Baez v. Astrue*, 550 F. Supp. 2d 210, 213 (D. Mass. 2008).

12-2p that fibromyalgia may be a disabling condition,' but there must be sufficient objective evidence to support a finding that a claimant's impairment(s) so limits her functional abilities that it precludes her from performing any substantial gainful activity."[9] *Medina-Augusto v. Comm'r of Soc. Sec.*, Civil No. 14-1431 (BJM), 2016 WL 782013, at *7 (D.P.R. Feb. 29, 2016) (quoting *Barowsky v. Colvin*, Case No. 15-cv-30019-KAR, 2016 WL 634067, at *12 (D. Mass. Feb. 17, 2016)). "SSR 12-2p provides step-by-step guidance on how to evaluate fibromyalgia in disability claims . . . [and] establishes the general criteria that a claimant (who has the burden of proof at steps one through four) may use to establish that she has a medically determinable impairment of fibromyalgia." *Id.* "The evidence provided must be from an acceptable medical source [-- '[a] licensed physician (a medical or osteopathic doctor)' --] and that evidence must not only contain the diagnosis (the policy specifically says that the SSA 'cannot rely upon the physician's diagnosis alone'), but also a review of the claimant's medical history, physical exam(s), treatment notes consistent with the diagnosis, and an assessment of physical strength and functional abilities." *Id.* (quoting SSR 12-2p, 2012 WL 3104869, at *2).  Although Plaintiff points to medical records that mention fibromyalgia or polyarthralgia, she did not present the ALJ or this court with a diagnosis of either condition from an "acceptable medical source" (Dkt. No. 18 at 13-14).[10]  SSR 12-2p, 2012 WL 3104869, at *2.

---

[9] Plaintiff cites SSR 85-28, 1985 WL 56856 (1985), which addresses determinations of non-severe impairments, but her argument omits any reference to SSR 12-2p, which specifically addresses fibromyalgia (Dkt. No. 18 at 11-14).

[10] Plaintiff's claim – that the Arthritis Treatment Center ("ATC") diagnosed her with chronic polyarthralgia – is not supported by the record.  In a barely legible note, the ATC record indicated that this was a "prior" diagnosis (A.R. at 567).  It was not attributed to a particular medical source (*id.*).  Even if Plaintiff had been diagnosed with polyarthralgia, the ALJ's statement -- that she considered "complaints that could be associated with . . . [the] diagnosis [of fibromyalgia] . . . in the context of [Plaintiff's] other medically determinable impairments" -- would have encompassed polyarthralgia symptoms (*id.* at 24).

Instead, Plaintiff argues that, in view of these notations,  the ALJ erred by failing to conclude that Plaintiff suffered from fibromyalgia and polyarthralgia based on her complaints of "pain all over her body," that was exacerbated by stress, and the medications that she was prescribed (Dkt. No. 18 at 13-14).  Plaintiff's argument, however, is contrary to the law which precludes an ALJ from making a medical diagnosis.  *See Manso-Pizarro,* 76 F.3d at 17 ("With a few exceptions (not relevant here), an ALJ, as a lay person, is not qualified to interpret raw data in a medical record."); *Thompson v. Astrue*, Civil Action No. 10-11742-JLT, 2012 WL 787367, at *8 (D. Mass. Feb. 17, 2012) ("The ALJ cannot render a medical diagnosis — he is simply not competent to do so.") (citing *Nguyen,* 172 F.3d at 35).  Accordingly, Plaintiff's argument fails.

> 2.       Remand would be futile because Plaintiff failed to present evidence that her spinal impairments, in combination with her obesity, medically equaled a severe impairment at step three.

Plaintiff next contends that the ALJ erred at step three by failing to analyze whether two of Plaintiff's impairments found to be severe at step two -- spinal disorders and obesity -- combined to medically equal Listing 1.04A of Appendix 1 (Dkt. No. 18 at 14-16; A.R. at 23). *See Healy v. Colvin*, Civil Action No. 12-30205-DJC, 2014 WL 1271698, at *11-12 (D. Mass. Mar. 27, 2014); *Arsenault v. Astrue*, 937 F. Supp. 2d 187, 189 (D. Mass. 2013); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.  For the following reasons, if the ALJ erred at step three, the misstep was harmless.

At step three of the sequential evaluation process, "the ALJ compares the medical evidence of the claimant's impairment 'to a list of impairments presumed severe enough to preclude any gainful work.'"  *Nichols v. Astrue*, Civil No. 11-cv-197-JD, 2012 WL 2192446, at *3 (D.N.H. June 14, 2012) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990)).  "If the claimant's impairment matches or is 'equal' to one of the listed impairments, [s]he qualifies for

benefits without further inquiry." *Sullivan*, 493 U.S. at 525 (citing 20 C.F.R. §

416.920(a)(4)(iii)).

"To match a listed impairment, the claimant's medically determinable impairment must

satisfy all of the listed criteria." *Nichols*, 2012 WL 2192446, at *4 (citing 20 C.F.R. §

404.1525(e)).  "An impairment or combination of impairments is medically equivalent to a listed

impairment if it is at least equal in severity and duration to the criteria of any listed impairment."

*Vest v. Astrue*, Civil Action No. 5:11cv047, 2012 WL 4503180, at *3 (W.D. Va. Sept. 28, 2012)

(citing 20 C.F.R. §§ 404.1526(a), 416.926(a)).  "The claimant bears the burden of showing that

he has an impairment or combination of impairments that meets or equals a listed impairment."

*Nichols*, 2012 WL 2192446, at *4 (citing *Torres v. Sec'y of Health & Human Servs.,* 870 F.2d

742, 745 (1st Cir.1989)).

At step two, the ALJ found that Plaintiff's severe medically determinable impairments

included lumbar and cervical degenerative changes, left C6 radiculopathy, and obesity (A.R. at

23).  Plaintiff proffered a Listing 1.04A Worksheet completed by Northgate for the ALJ's

consideration at step three (*id*. at 622).  In order to be found disabled at step three based on

Listing 1.04A, Plaintiff was required to meet or equal the following criteria:

> 1.04  Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.  Because, according to the worksheet, Plaintiff did

not suffer from "motor loss . . . accompanied by sensory or reflex loss," it is undisputed that she

did not meet the listed criteria and, therefore, could not be found disabled at step three due to her spinal disorders alone (A.R. at 622).  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.  *See Sullivan*, 493 U.S. at 530 ("For a claimant to show that [her] impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

At step three, the ALJ determined that Plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (A.R. at 25).  Despite Plaintiff's failure to argue to the ALJ that the combination of her spinal disorders and obesity medically equaled Listing 1.04A, she now challenges the ALJ's step three finding and seeks remand contending that the ALJ "ought to have at least analyzed Listing 1.04[A] and examined how the objective findings on the record, combined with . . . [Plaintiff's] obesity related to that Listing" (Dkt. No. 18 at 16).  *Compare Healy*, 2014 WL 1271698, at *12 (remand warranted where plaintiff argued to the ALJ that her "'inability to ambulate effectively'" due to a combination of obesity and a joint impairment equaled a listing, but the ALJ failed to address plaintiff's contention at step three) (quoting SSR 02-1p, 2002 WL 34686281, at *5); *Stratton v. Astrue*, 987 F. Supp. 2d 135, 144-46 (D.N.H. 2012) (remanding case for ALJ to consider Listing 3.03 at step three because, at the hearing, plaintiff "put the ALJ on notice that she believed her asthma met [that listing]").

"'Courts differ in the extent to which at step three the ALJ must discuss whether the claimant's severe conditions medically equaled a listing [.]'"  *Arrington v. Colvin*, CIVIL ACTION NO. 15-10158-JGD, 2016 WL 6561550, at *10 (D. Mass. Nov. 3, 2016) (quoting *Medina–Augusto,* 2016 WL 782013, at *8).  "The First Circuit appears not to have addressed this issue, and the courts in this district have not yet reached a consensus."  *Id*.  *Compare Arsenault,*

937 F. Supp. 2d at 189 (remanding case so that ALJ could evaluate the evidence, compare it to the relevant Listing, and provide an explanation for his conclusion at step three) *with Rivera v. Barnhart*, No. Civ.A. 04–30131–KPN, 2005 WL 670538, at *5 (D. Mass. Mar. 14, 2005) ("the failure – if failure it is – to make specific findings as to whether a claimant's impairment meets the requirements of a listed impairment is an insufficient reason in and of itself for setting aside an administrative finding"). *See also Fiske v. Astrue*, Civil Action No. 10-40059-TSH, 2012 WL 1065480, at *9 (D. Mass. Mar. 27, 2012) ("[T]he failure of the ALJ to make specific findings as to whether a claimant's impairment meets the requirements of a listed impairment is an insufficient reason solely for setting aside an administrative finding.").  "Nevertheless, the First Circuit has held that 'a remand is not essential if it will amount to no more than an empty exercise.'" *Arrington*, 2016 WL 6561660, at *10 (quoting *Ward*, 211 F.3d at 656).  "Because this court concludes that a remand for further explanation or analysis at step three would amount to nothing more than an empty exercise, [Plaintiff] has not shown that the ALJ's failure to compare [her] impairments to Listing[] . . . 1.04 constitutes grounds for a ruling in [her] favor." *Id. Compare Erickson v. Colvin*, No. 2:13-cv-1061-EFB, 2014 WL 4925256, at *3 (E.D. Cal. Sept. 30, 2014) (affirming the step three analysis despite ALJ's failure to specifically address plaintiff's fibromyalgia because plaintiff did not meet her burden of proof by pointing to any listing she believed her impairment equaled, addressing the standard for meeting that listing, or citing evidence in the record to support her argument).

Obesity is not a listed impairment in Appendix 1.  *See* SSR 02-1p, 2002 WL 34686281, at *1.  The ALJ recognized SSR 02-1p's advisement that the combination of obesity and other impairments, including those of the musculoskeletal system, may equal the severity of a listed impairment at step three of the sequential evaluation process based upon the degree of functional

limitation (A.R. at 24). [11]  *Id.  See also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00Q; SSR 02-1p,

2002 WL 34686281, at *5.  As mentioned earlier, conditions that impinge the nerve roots or

compress the spinal cord causing functional loss are the gravamen of Listing 1.04A.  *See* 20

C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.  *See also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00K

("Disorders of the spine, listed in 1.04, result in limitations because of distortion of the bony and

ligamentous architecture of the spine and associated impingement of the nerve roots (including

the cauda equine) or spinal cord.").  The introduction to Listing 1.04 states that "functional loss

for purposes of these listings is defined as the inability to ambulate effectively on a sustained

basis for any reason . . . or the inability to perform fine and gross movements effectively on a

sustained basis for any reason . . . for at least 12 months."  20 C.F.R. Pt. 404, Subpt. P, App. 1, §

1.00B2a. [12]  To establish medical equivalency, Plaintiff has the burden to "present medical

findings equal in severity to the Listing criteria."  *Vest*, 2012 WL 4503180, at *3.  However, she

fails to point to any medical evidence or opinion that the cumulative effects of her spinal

disorders and obesity caused the requisite degree of functional loss.  *See Morrison v. Astrue*,

C.A. No. 11-cv-30156-MAP, 2012 WL 3527121, at *5 (D. Mass. Aug. 13, 2012) (finding that

ALJ was not required to explicitly consider a listing where there was no record evidence of

listing criteria); SSR 02-1p, 2002 WL 34686281, at *6 (An ALJ "will not make assumptions

about the severity or functional effects of obesity combined with other impairments.").

---

[11] In crafting the RFC, the ALJ "include[ed] the potential effects of the [Plaintiff's] obesity upon her functional status . . ." (A.R. at 25) (citing SSR 02-1p, 2002 WL 34686281, at *1).

[12] "An impairment meets the requirement of a Listing when it satisfies all of the criteria of that Listing, including any relevant criteria in the introduction, and meets the duration requirement." *Vest*, 2012 WL 4503180, at *4 n.4 (citing 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3)).

Because "there exists substantial evidence in the decision as a whole for the step three determination," remand is not warranted. *Fiske,* 2012 WL 1065480, at *9 (citing *Reyes Robles v. Finch*, 409 F.2d 84, 86 (1st Cir. 1969)). *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) ("[A]n ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment."); *Arrington*, 2016 WL 6561550, at *10; *Marshall v. Colvin*, Civil No. 13-cv-363-PB, 2014 WL 4258262, at *11 (D.N.H. Aug. 27, 2014) (affirming despite the ALJ's failure to reference specific evidence to support the step three determination regarding plaintiff's cerebral trauma because the decision, viewed in its entirety, supported the finding).  "Although the ALJ in this case did not specifically cite Listing 1.04A in her opinion, she discussed the medical evidence of record that showed that [P]laintiff's combination of impairments did not result in all of the specific medical findings necessary to stop the sequential evaluation process at step three." *Lewis v. Astrue*, No. 4:10CV1131 FRB, 2011 WL 4407728, at *23 (E.D. Mo. Sept. 22, 2011).  *Contrast Healy*, 2014 WL 1271698, at *11-12 (finding remand necessary because, despite plaintiff's argument that her joint pain and obesity, which impaired her ability to walk, medically equaled Listings 1.00, 1.01, or 1.02, the ALJ's failure to compare the medical evidence to these listings did not permit judicial review); *Costa v. Astrue*, C.A. No. 08-395 S, 2009 WL 3366961, at *11 (D.R.I. Oct. 15, 2009) ("While the final outcome may well remain the same, the record is not clear enough to support Defendant's arguments and reach a harmless error conclusion.").  The ALJ's conclusion is supported by the record.

Plaintiff worked as a medical secretary for seven years, from about 2005 until June 14, 2012, when she stopped working and alleged onset of her disability (A.R. at 21, 44, 625).  After reviewing Plaintiff's medical records that included Plaintiff's employment period and extended to

2013, the ALJ determined that Plaintiff's spinal disorders were more severe during the time that she worked (*id.* at 27).  Plaintiff's weight remained substantially the same during the entire period that the ALJ considered (*see, e.g., id.* at 481 [171 pounds in 2009], 484 [172 pounds in 2011], 543 [176 pounds in July 2012], 588 [180 pounds in May 2013]).  In other words, she was able to perform her job as a medical secretary despite her obesity.

Both Dr. Comey and Dr. Borowsky ruled out spinal cord compression (*id.* at 27, 588, 593). [13]  Dr. Borowsky described Plaintiff as "severely overweight" in August 2013 when he observed that her gait and station were normal, and her range of motion in her neck and back were eighty percent and seventy percent respectively (*id.* at 26, 591-92).  Her straight leg raises were negative bilaterally in September 2012 and were "weakly positive" on the right, and negative on the left in August 2013 (*id.* at 560, 592).  At that time, her motor strength in her biceps and triceps was intact, her range of motion was full in both wrists, and her grip strength in her hands was five on a scale of five (*id.*).  Dr. Borowsky examined Plaintiff's reflexes and opined that her coordination was normal and she had "[g]ood mobility of all extremities" (*id.* at 26, 592).  The ALJ gave Dr. Borowsky's opinion "great weight" (*id*. at 27).

In addition, Dr. Borowsky's report indicated that Plaintiff was "functionally independent at home" (*id.* at 590).  She dressed and bathed independently and drove, shopped for food, and did her laundry at her daughter's house twice a month (*id.* at 26, 27, 50, 553).  She saw her four-year-old and seven-year-old grandchildren every day and cared for them "'sometimes'" with her son, although he worked from 7:00 a.m. to 1:00 p.m. every day (*id.* at 26, 27, 49).

---

[13] Spinal cord compression is a necessary component of Listing 1.04A.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04A.

Because the record is sufficient for the court to determine that the combination of Plaintiff's spinal disorders and obesity did not medically equal Listing 1.04A and that the ALJ's step three determination was supported by substantial evidence, remand would not alter the outcome. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Accordingly, Plaintiff's request for remand is denied.

3.      The RFC is supported by substantial evidence.

Finally, Plaintiff contends that the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain (Dkt. No. 18 at 16-20). The court disagrees. The ALJ's decision contains clear and convincing reasons for discounting Plaintiff's descriptions of the intensity of her pain. *See, e.g., Pires v. Astrue*, 553 F. Supp. 2d 15, 22 (D. Mass. 2008) (if an ALJ finds the claimant's impairments, as demonstrated by objective medical evidence, reasonably can be expected to cause pain, an ALJ must evaluate whether the functionally limiting effect of the pain is disabling).

At the hearing before the ALJ, Plaintiff described the "terrible" pain in her lower back, which radiated into her legs, and the constant "burning" pain in her neck, which made it difficult to raise her arms (A.R. at 46, 53, 54, 55, 57).[14] The ALJ determined that Plaintiff's "complaints of incapacitating pain and other symptoms are neither reasonably consistent with [the objective] medical findings nor sufficiently credible as additive evidence to support a finding of disability" (*id.* at 26). *See Bourinot v. Colvin*, 95 F. Supp. 3d 161, 180-81 (D. Mass. 2015) (issue for the

---

[14] The RFC's limit on lifting twenty pounds occasionally and ten pounds frequently, with occasional overhead reaching, addressed Plaintiff's pain caused by raising her arms (A.R. at 25, 26).

court is whether ALJ's credibility determination is supported by substantial record evidence).

This opinion is supported by substantial evidence.

In determining Plaintiff's credibility, the ALJ properly considered the fact that Plaintiff had worked as a medical secretary when her neck and back impairments were more severe than they were after June 14, 2012 when she stopped working and filed a claim for benefits (A.R. at 27). *See Mowery v. Heckler*, 771 F.2d 966, 971 (6th Cir. 1985) ("Prior work with an impairment may, of course, be a legitimate factor for consideration."); *Cauthen v. Finch,* 426 F.2d 891, 892 (4th Cir. 1972) (finding claimant was not disabled where she had eye problems of long standing, worked regularly for years despite the problem, and had no significant deterioration); *Pruitt v. Astrue*, Civil Action No. 9:10-2439-RMG, 2011 WL 6207035, at *2 (D.S.C. Dec. 13, 2011) ("'absent showing of significant worsening of condition, ability to work with impairment detracts from finding of disability'") (citing *Orrick v. Sullivan*, 966 F.2d 368, 370 (8th Cir. 1992)).  The ALJ's conclusion – that Plaintiff's condition improved after she stopped working in June 2012 – was supported by comparing the imaging studies conducted while Plaintiff worked with the August 2012 and April 2013 radiological studies and Dr. Comey's and Dr. Borowsky's interpretations of those images (A.R. at 26-27).  *See Cordero v. Colvin*, Civil Action No. 10-12104-DJC, 2013 WL 5436970, at *16 (D. Mass. Sept. 25, 2013) ("The ALJ may rely on objective medical evidence that demonstrates improvement in physical impairments to support his conclusion that complaints are not credible.") (quoting SSR 96–7p, 1996 WL 374186, at *6 (July 2, 1996); 20 C.F.R. § 404.1529(c) (2)); *Lopez Vargas v. Comm'r of Soc. Sec.*, 518 F. Supp. 2d 333, 339 (D.P.R. 2007) (ALJ determined, based on medical opinions, that claimant's condition had improved).  *Compare Westbrook v. Astrue,* C.A. No. 09-cv-30019-MAP, 2009 WL 4017761, at *6 (D. Mass. Nov. 18, 2009) (court noted that medical evidence showed plaintiff's

pain and flexibility had improved over time).  An MRI of Plaintiff's neck in March 2011 showed mild central canal stenosis secondary to a mild posterior disc bulge at the C2-C3 level and moderate central canal stenosis secondary to a posterior disc bulge at the C3-C4 level (A.R. at 362).  Although the C3-C4, C4-C5 and C5-C6 levels showed "large posterior disc bulges, cord compression, canal stenosis and bilateral neural foramina stenoses" in 2011, the study two years later in April 2013 showed "mild to moderate central left neural foraminal stenosis" at C5-C6 and an overall impression of multilevel spondylosis (*id.* at 27, 362, 609-10).  Dr. Comey interpreted the April 2013 radiological studies of Plaintiff's neck and upper back as showing "slight" stenosis at C4-C5 and C5-C6 and "to a lesser extent" at C6-C7 (*id*. at 27, 588).  He found that there was "no significant cord compression or signal change" (*id.*).  Similarly, Dr. Borowsky diagnosed cervical spondylosis without myopathy (*id.* at 27, 593).

The MRI of Plaintiff's lumbosacral spine in March 2011, while she worked, showed "mild central and moderate lateral canal stenosis secondary to a posterior disc bulge and hypertrophic apophyseal joints" at L3-L4 (*id.* at 363).  At the L4-L5 level, the central and lateral canal stenosis was "severe" (*id*.).  In contrast, the August 2012 MRI of Plaintiff's lumbar spine showed "mild central canal stenosis and mild bilateral neural foraminal narrowing" at the L4-L5 level (*id.* at 614).  Based on these images, Dr. Borowsky diagnosed lumbar spondylosis without myelopathy (*id.* at 27, 593).

Plaintiff faults the ALJ for giving Dr. Comey's and Dr. Borowsky's opinions great weight while according no weight to the opinions of Dr. Oms-Rivera, which he offered in March 2012, the Northgate PA, and UMass. Disability Determination Services, who all opined that Plaintiff was disabled (Dkt. No. 18 at 21; A.R. at 27, 391, 578, 586-87).  However, the court will not disturb the ALJ's resolution of conflicts in the evidence, *see Irlanda Ortiz*, 955 F.2d at 769,

because Dr. Comey's and Dr. Borowsky's opinions were amply supported by the radiological images and their examinations of Plaintiff as well as the opinions of the two state agency consultants who determined that Plaintiff was not disabled (A.R. at 75-79, 101-04).  *See Boulia*, 2016 WL 3882870, at *8 (ALJ gave "'some weight'" to opinions of state agency consulting examiners); *Coggon v. Barnhart*, 354 F. Supp. 2d 40, 54 (D. Mass. 2005) (ALJ should consider the findings of non-examining sources, such as state physicians) (citing 20 C.F.R. § 404.1527(f)(2)(i)).

In addition to the medical evidence, the ALJ properly relied on Plaintiff's "conservative treatment history," particularly the effectiveness of medication, and the extent of her daily activities to support the determination that Plaintiff did not suffer from incapacitating pain (A.R. at 26-27).  Plaintiff attempts to refute this finding by pointing out that Dr. Comey did not recommend surgery because he was "not optimistic that surgical intervention would be likely to provide [Plaintiff] with any significant measure of lasting pain relief" due to the "widespread" cervical and lumbar spondylosis (Dkt. No. 18 at 18; A.R. at 589).  While "a physician's decision not to recommend surgery is not substantial evidence that a claimant is not disabled," *Nusraty v. Colvin*, 15-CV-2018 (MKB), 2016 WL 5477588, at *11 (E.D.N.Y. Sept. 29, 2016), the ALJ's credibility determination did not hinge solely on the absence of surgery.  The ALJ also considered the effectiveness of medication (A.R. at 27).  *See Avery v. Sec'y of Health & Human Servs.,* 797 F.2d 19, 29 (1st Cir. 1986) (holding that ALJ must consider effectiveness of pain medication as a factor in assessing claimant's credibility regarding severity of pain that is not supported by medical evidence); *Hewes v. Astrue*, No. 1:10-cv-513-JAW, 2011 WL 4501050, at *7 (D. Me. Sept. 27, 2011) (ALJ considered effectiveness of pain medication as a factor in determining claimant's credibility); 20 C.F.R. § 404.1529(c)(3)(iv).  In December 2013, Plaintiff

reported to Dr. Borowsky that the left C7-T1 steroid injection improved her radicular symptoms and that amitriptyline and gabapentin helped her leg symptoms "quite a lot" (A.R. at 595, 600). She testified that medication alleviated the pain (*id.* at 46).

The ALJ permissibly relied on Plaintiff's "wide range of daily activities" to discount her testimony regarding the severity of her pain (*id.* at 27). *See Teixeira v. Astrue*, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("evidence of daily activities can be used to support a negative credibility finding") (citing *Berrios Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 429 (1st Cir. 1991)). Dr. Borowsky's record indicates that Plaintiff was "functionally independent at home" in December 2013 (A.R. at 595). Gandara's assessment, Dr. Bishop's report, and Plaintiff's testimony indicate that she dressed and bathed herself, did household chores, saw her young grandchildren most days and cared for them "sometimes" with her son, shopped, cooked, did laundry, used the computer occasionally, drove, and paid a monthly bill (*id.* at 27, 48-50, 582, 624). Although the court agrees with Plaintiff's assessment that the ALJ misinterpreted Gandara's note and that she did not want to look for work because of pain (*id.* at 26, 589), there was sufficient other evidence to support the ALJ's credibility determination. *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ("[A]n ALJ's error was harmless where the ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record."). Because substantial evidence supported the ALJ's credibility determination and the RFC, it will be affirmed.

V.     CONCLUSION

For the reasons stated above, Plaintiff's motion for an order reversing the Commissioner's decision (Dkt. No. 17) is DENIED, and the Acting Commissioner's motion to affirm the decision (Dkt. No. 21) is GRANTED.

It is so ordered.

Dated:  December 28, 2016                           /s/ Katherine A. Robertson
                                                    KATHERINE A. ROBERTSON
                                                    United States Magistrate Judge